UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARIA BUSONE, Individually, and MARIA
BUSONE, As Proposed Administrator of Jovani
Ligurgo, Deceased,

**MEMORANDUM &
ORDER**
Civil Action No. 19-3332

Plaintiffs,

-against-

COUNTY OF SUFFOLK in its individual and
official capacities; COUNTY OF SUFFOLK
JOHN AND JANE DOE (municipal agents,
employees, consultants and/or independent
contractors) #1-10 who might be further
identified in further prosecution of this claim,
in their individual and official capacity;
SUFFOLK COUJNTY POLICE DEPARTMENT
ARSON SECTION JOHN DOE AND JANE
DOE ##1-5 who might be further identified in
further prosecution of this claim, in their
individual and official capacity; SUFFOLK
COUNTY POLICE DEPARTMENT JOHN DOE
AND JANE DOE (municipal agents, employees,
consultants and/or independent contractors)
#1-10 who might be further identified in further
prosecution of this claim, in their individual and
official capacity; SCPD OFFICER T. MICHAEL
PALUMBO, in his individual and official capacity,
SCPD DETECTIVE ROBERT DOROSKI;
SCPD OFFICER NORBERTO E. FLORES, in his
individual and official capacity, SCPD OFFICER
MATTHEW LOEW, in his individual and official
capacity, SCPD DETECTIVE JOHN GELLINEAU,
in his individual and official capacity, UNKNOWN SCPD
POLICE DISPATCHERS  ##1-5 who might be
further identified in further prosecution of this claim,
in their individual and official capacity; UNKNOWN
SCPD 911 OPERATORS DOE ##1-5 who might be
further identified in further prosecution of this claim,
in their individual and official capacity,

Defendants.

------------------------------------------------------------X

**APPEARANCES:**

**For Plaintiff:**
Law Firm of Vaughn, Weber & Prakope, PLLC
393 Jericho Turnpike, Suite 208
Mineola, New York 11501
By:    Timothy B. Prakope, Esq.
          John A. Weber IV, Esq.


**For Defendants**
Dennis M. Brown, Suffolk county Attorney
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box. 6100
Hauppauge, New York 11788
By:    Brian C. Mitchell, Assist. County Attorney

**HURLEY, Senior District Judge:**

   Plaintiff Maria Busone, individually and as the proposed administrator of her

infant child Jovani Ligurgo ("Plaintiff" or "Busone") commenced this action

asserting claims pursuant to 42 U.S.C. §§ 1983, 1985 and 1986, as well as state

common law claims, seeking to recover damages for defendants' role in the tragic

death of her 2-year-old son, Jovani Ligurgo ("Jovani"), who was killed by his father,

John Ligurgo ("Ligurgo") during an on-going custody dispute with Busone. Although

originally naming various New York State and Suffolk County entities and

individuals, Plaintiff dismissed her claims against the New York State defendants.[1]

Presently before the Court is a motion to dismiss pursuant to Fed. R. Civ. P.

12(b)(6) by the remaining defendants, viz., the County of Suffolk ("Suffolk" or the

---

[1] As a result of that dismissal, the caption was amended as set forth above.

"County"), Police Officer Michael Palumbo ("Palumbo"), Police Officer John Gellineau ("Gellineau"), Police Officer Matthew Loeb ("Loeb"), Police Officer Norberto E. Flores ("Flores") and Detective Doroski ("Doroski") (collectively "Defendants"). For the reasons set forth below, the motion is granted.

## BACKGROUND

The following allegations are taken from the Amended Complaint ("AC") and presumed true for purposes of this motion.

Busone and Ligurgo were in a romantic relationship and had a son, Jovani, born on October 9, 2015. "On December 3, 2017 at approximately 11:45 p.m., while [she was] residing at 268 Brettonwoods Drive, Coram, a New York State Domestic Incident Report was filed [by Busone] as a result of a domestic dispute" between Busone and Ligurgo. "It was a verbal argument . . . over childcare." The responding officer noted that Ligurgo had a New York State issued Pistol License. The responding officers did not take the threat Ligurgo posed to Plaintiff "seriously," did not make Ligurgo leave the residence, and failed to arrest Ligurgo. (AC ¶¶ 69-82.)

On March 20, 2018, Busone filed a petition for custody in which she alleged that Ligurgo was frequently verbally abusive as well as physically violent with both her and Jovani and requested a temporary order of protection. On April 13, 2018, Busone left the family residence in Coram and moved with Jovani to 8 Wesleyan Road, Smithtown, New York. Before she left, she took a photograph of the rifle and ammunition that Ligurgo had recently purchased. On April 17, 2019, Busone and Ligurgo appeared in court in connection with the petition for custody. They entered

into a stipulation of temporary settlement whereby Busone was to drop Jovani off at Ligurgo's residence at 7:00 a.m. and Ligurgo was to return Jovanni to Busone at her place of employment between 3:30 and 4:00 p.m. "There were further guidelines for the weekend." A second court conference was held on May 7, 2018 at which time the schedule set forth in the temporary settlement was extended to June 8, 2018, the date of the next court conference. (AC ¶¶ 82-101.)

On June 5, 2018, in accordance with the foregoing schedule, Busone dropped Jovani off at his father's residence; however, Ligurgo failed to return Jovani to his mother between 3:30 and 4:00 p.m. Unknown to Busone, at about 3:30, one Joseph Bialkoski, a neighbor of Ligurgo saw Ligurgo rushing to leave his residence while the fire alarm was going off. At 3:35 one Robert Pieper called 911 to report the fire at Ligurgo's residence. At 3:40 the police arrived and Bialkoski told the Suffolk County Police Department ("SCPD") that he saw Ligurgo hastily leaving what appeared to be a fire at his home. (AC ¶¶ 102-110.)

On June 5, 2018, Busone attempted to call Ligurgo at about 4:15 but discovered her cell phone was disconnected and inoperable. She therefore went back into her place of employment to call from one of the land lines but was unable to reach Ligurgo as he had disconnected his cell phone number earlier in the day. Busone then called her attorney who instructed her to call 911. During her call to 911 she told the operator that Ligurgo "took" their son, "stole" him. The operator asked if she had sole custody and Busone responded no but Ligurgo had threatened several times to leave and take Jovani with him. When asked when he took the

child, Busone responded that she didn't know but he was supposed to return Jovani at 3:30. The operator characterized the problem as a failure to return the child and told Busone that a unit would be sent to her place of employment when one was available. (AC ¶¶ 137-150.)

When Busone finished the call with 911 she called the condo association where Ligurgo lived to see if someone could check to see if Ligurgo was there. She was told "no" because there was a fire at the complex but Busone was not told which apartment was on fire. Busone then called the Brookhaven Fire Department to try to determine which apartment was on fire but received no information. One of Busone's co-workers then called 911 at about 4:34 p.m. to inform them that one of the apartments in the complex where Ligurgo lived was on fire and that Busone believed the fire and kidnapping were related. The co-worker was told an officer would come when available. At about "4:36 p.m." Busone called the condo association and was informed that "Condo 2" was on fire; that is where Ligurgo resided. "[A]t around 4:35 p.m." Busone made a third call to 911 and informed them "her apartment was on fire and they should send a police car to her apartment complex rather than the location of the job" because she was going to the apartment complex to make sure her son was okay. The operator told her she would have to cancel the call for now and Busone would need to call again once she was at the complex. (AC ¶¶ 150-159.)

At approximately 5:00 p.m. Busone left her place of employment and drove to the apartment complex, arriving there about 5:20 p.m. At about the same time, a

police unit arrived at Busone's place of employment, about one hour after the initial 911 call was placed. When Busone arrived at the complex she informed a police officer that her son was kidnapped, her cell phone disconnected and the Ligurgo had possession and access to firearms. She asked that an AMBER alert be issued. It is claimed that the police and the 911 operators told Busone not to interfere with an ongoing investigation. At about 7:10 Police Commissioner Hart issued a "BOLO"[2] for Ligurgo. And although a police officer stated an AMBER alert was issued, it was not despite Busone's pleas for one to be issued. At about 7:30 p.m. Ligurgo drove over the George Washington Bridge into New Jersey and continued onto Virginia. (AC ¶¶166-200.)

At some point on June 5, 2018, Busone completed a Domestic Incident Report ("DIR") with the assistance of Loew, informing the "SCPD Officers" that Ligurgo had failed to return Jovani, had shut off his cell, "was under an ongoing arson investigation for the fire at their former custodial home," and had left with Jovani without her permission. She told Loeb and Palumbo, that she feared Ligurgo would hurt Jovanni as he was violent, had access to guns, and had threatened to kill her and Jovani in the past. Loew also completed a missing persons report as to Jovani and indicated that the crime of custodial interference had occurred. Although a "Be on the Lookout" ("BOLO") was put out as to Ligurgo and his vehicle, no AMBER alert was issued. (AC ¶¶ 102-127.)

---

[2] BOLO is a police term standing for "Be on the lookout for;" a BOLO is used by law enforcement to alert other law enforcement about a suspect, person of interest or vehicle.

At about 7:35 Busone "attempted to put a photo of Ligurgo and his vehicle on Facebook so that anyone connected to their page would be able to help stop Ligurgo" but Doroski overheard the conversation between Busone and her son and "ordered them to remove the information from Facebook," "telling [Busone] that it would interfere with the police investigation and that the SCPD [was] working to find Jovani." Busone and her son Anthony "posted a photograph of [Jovani] and a photograph of [Ligurgo's] vehicle on Facebook [a]long with . . . a message pleading for the public's help in finding the vehicle and saving Jovani from the imminent danger he faced." After Doroski "told her to remove the post, Busone complied in fear of repercussions." (AC ¶¶ 200-210.)

At about 8:30 p.m. Busone went to the Sixth Precinct to further discuss the investigation. She suggested the police use the media to assist them in their search efforts but they ignored her. At about 9:30 Palumbo informed Busone that the license plate for Ligurgo's vehicle was tracked crossing the George Washington Bridge. She again asked for an AMBER Alert was told that the New York State Police had declined to activate the AMBER Alert system. She continued to press for an AMBER Alert but "Defendants" declined her request and "reiterated the importance for not interfering with the police investigation." "Upon information and belief Defendants SCPD and SCPD Officers directed Busone to go home and refrain from talking to the media." Busone left the precinct at about 12:30 a.m., at which point no AMBER Alert was issued. Shortly after Bussone left the precinct, the SCPD held a press conference and requested the public's help in locating Jovani and

Ligurgo. After receiving information that Ligurgo had crossed into New Jersey, SCPD did not alert the New Jersey Police of the situation. (AC ¶¶ 219-268.)

On June 6, 2018 at approximately 8:45 a.m., the bodies of Jovani and Ligurgo were found in Raphine, Virginia in Ligurgo's vehicle with fatal gunshot wounds. (AC ¶ 269.)

One month later, Palumbo prepared a Supplementary Report to the Missing Person Report. According to that report, Loew notified his unit that Jovani was missing, having been last seen at 7:00 a.m. on June 5, 2018 and he was assigned the case; a canvas of the area was conducted with negative results. The Report states that he interviewed Busone who told him that the child was missing, that there was an ongoing custody dispute and that Ligurgo had a hunting rifle that was not located in the house during the arson search. A notification was sent out via the MDC system with a photograph, teletype notifications to NYPD, Nassau County, New Jersey and Pennsylvania Police Departments. SCPD contacted Verizon who confirmed that Ligurgo had disconnected his cell phone and received a new number, which was pinged with a location in Brick Township at approximately 7:12 p.m. Brick Township Police Department was notified "with negative results." Further pings revealed no new information on the location. "SCPD contacted PIO reference a release to the media with photographs." "SCPD stated the New York State Police were contacted but the facts of the case do not fit the criteria for AMBER Alert. No such record was provided to Plaintiff." (AC 271-283.)

According to an "August 20, 2018 Incident Report Continuation," on June 5, 2018, a SCPD Incident Report was completed by Gellineau and reviewed by his supervisor, for the fire at Ligurgo's residence. An investigation of the fire determined that the fire detection system was intentionally tampered with to prolong or avoid detection of the fire and that there was a strong possibility that an ignitable liquid was used to start the fire. "Pursuant to the Incident Report," Busone was interviewed at the scene of the fire and told the police that Ligurgo had failed to return Jovani and she had reported the child missing. Gellineau concluded that Ligurgo "was seen fleeing the property at the time the fire alarm was sounding and apparently fled the state with the child. The case was identified as an ARSON 3rd and will be carried as EXCEPTIONALLY CLEARED since the offender of this crime is deceased." (AC ¶¶128-137) (capitalization in original).

Based on the foregoing, Plaintiff asserts the following federal claims against Defendants: violations of Plaintiff's (1) Substantive Due Process Rights - State Created Danger" (Count I); Substantive Due process - Special Relationship (Count II); "First Amendment Rights (Count IV); Fourth Amendment Rights (Count V); and Monell Claims against the County (Counts III and VI) under 42 U.S.C. §§ 1983, 1985 and 1986. She also asserts state law claims for negligence, gross negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, wrongful death, negligent hiring training and supervision, and prima facie tort.

**DISCUSSION**

**I.      Rule 12(b)(6) Motion to Dismiss Standard**

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  The plausibility standard is guided by two principles.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions.  Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.  A plaintiff must provide facts sufficient to allow each named defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.  *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss.  *Iqbal,* 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility

standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).  Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

### B.     Materials Considered on a Rule 12(b)(6) Motion to Dismiss

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court is generally limited to the complaint and documents attached thereto.  *See* Fed. R. Civ. P. 12(d); *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013).  A court "'may also consider matters of which judicial notice may be taken.'"  *Apotex Inc. v. Acorda Therapeutics, Inc.* 823 F.3d 51, 60 (2d Cir. 2016) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)); *see Bristol v. Nassau County*, 2016 WL 2760339 (E.D.N.Y. May 12, 2016) ("On a motion to dismiss, consideration is limited to the factual allegations in plaintiff's amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of

which plaintiff had knowledge and relied on in bringing suit." (internal quotation marks omitted)).

Consistent with the foregoing standard, the Court will not consider the materials submitted by Plaintiff in opposition to the motion to dismiss, which include, among other things, deposition transcripts.

## II.     Section 1983 Claims

Section 1983 does not create substantive rights; "it merely provides remedies for deprivations of rights established elsewhere." *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985). Therefore, Plaintiff's 1983 claims against the officers and the municipalities "depend on a single threshold question: did the [Defendants'] actions violate [Plaintiff's] constitutional rights?" *Matican v. City of N.Y.*, 524 F.3d 151, 154 (2d Cir. 2008) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, (1986) (per curiam) ). Otherwise, a section 1983 claim against individuals or municipalities necessarily fails. *Id*.

With respect to Plaintiff's 1983 claims, the Court will first address her Substantive Due Process claim. It will then proceed to her Fourth Amendment and First Amendment claims. Lastly, her *Monell* claim against the County will be addressed.

### A.     Substantive Due Process

The Fourteenth Amendment's due process clause protects individual's against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *see Leebaert v. Harrington*, 332 F.3d 134, 139 (2d Cir. 2003) ("The

touchstone of due process is protection of the individual against arbitrary action of government."). "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill advised." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir.1995) (internal quotation marks omitted); *see Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir. 1994). "To state a substantive due process claim, a plaintiff must allege that . . . the state action that deprived [her] of [a constitutionally protected] interest was oppressive or arbitrary." *HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *12 (S.D.N.Y. Sept. 27, 2012) (internal quotation marks omitted).

Substantive due process has been interpreted to include an "individual's interest in bodily integrity." *Lombardi v. Whitman*, 485 F.3d 73, 78-79 (2d Cir. 2007). However, the Supreme Court has made clear that the Due Process Clause of the Fourteenth Amendment contains no language requiring "the State to protect the life, liberty, and property of its citizens against invasion by private actors," nor does it confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 195–96 (1989). The purpose of the due process clause was "to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196.

The rule set forth in *DeShaney* is subject to two "separate and distinct" narrow exceptions, *Pena v. DePrisco*, 432 F.3d 98, 109 (2d Cir. 2005). A substantive due process claim arising out of a private harm may be stated if: (1) the victim of the private conduct had a "special relationship" with the state, or (2) the state itself "created or increased the danger to the individual." *Matican*, 524 F.3d at 155 (2d Cir. 2008); *accord Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993). If one of these two exceptions is applicable then the complaining party must also "show that the officers' behavior was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. " *Matican*, 524 F.3d at 155 (internal quotation marks omitted).

Here, the question is whether Plaintiff has plausibly alleged a "special relationship."[3]

In *DeShaney*, the Supreme Court held that no "special relationship" arises by virtue of "the State's knowledge of the individual's predicament or from its expressions of intent to help him." Rather "it is the State's *affirmative act of restraining the individual's freedom to act on his own behalf* - through incarceration, or similar restraint of personal liberty - which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *DeShaney,* 489 U.S. at 200 (emphasis added). In other words, the touchstone of the "special relationship"

---

[3] Although a state-created danger claim was asserted in the amended complaint, Plaintiff has withdrawn that claim. Pl.'s Mem. in Opp. (DE 37-6) at 7.

exception to the *DeShaney* rule is the requirement that the state has somehow placed the individual within its custody. *Matican*, 524 F.3d at 156; *Robischung-Walsh v. Nassau Cty. Police Dep't*, F. App'x 38, 40 (2d Cir. 2011).

Plaintiff maintains that the "[Amended] Complaint demonstrates multiple instances where the [County] actors deprived Plaintiff's liberty to care for herself or her infant child" but directs the Court's attention to only two incidents. First, she points to the 911 operators refusal to reroute the call to meet her at the scene of the arson and abduction (rather than her place of employment), which "effectively [held] her on location to get police assistance . . . ." Pl.'s Mem. in Opp. at 6. Second, she relies on when the "Suffolk Defendants ordered her to refrain from using social media and giving interviews with news media "which was an "assumption of complete control over the investigation by Suffolk Defendants result[ing] in Plaintiff's deprivation of liberty.' *Id.* at 6-7. However, she cites no caselaw to support this theory of a special relationship.

Plaintiff's argument fails. The special relationship exception requires a custodial relationship, such as imprisonment, involuntary institutionalization, or the placement of a child in foster care. *Cruz v. N.Y. City Hous. Auth*, 2004 WL 1970143 at *8 (S.D.N.Y. Sept. 3, 2004) (noting "the Second Circuit has . . . only recognized 'custodial relationships such as [between] a prison and inmate[,] or a mental institution and involuntarily committed patient, and the relationship between a social service agency and foster child' as imposing an affirmative duty to protect on state actors" (quoting *Ying Jing Gan*, 996 F.2d at 533)); *Almonte v.*

*Suffolk County,* 2011 WL 5245260 (E.D.N.Y. Nov. 2, 2011) ("The touchstone of the 'special relationship' exception to the *DeShaney* rule is the requirement that the state has somehow placed the victim within its custody.").  The special relationship exception does not apply to non-custodial relationships such as that existing between a confidential informant and the government. *Matican,* 524 F.3d at 156. Nothing in the amended complaint supports that either Plaintiff or Jovani[4] were ever in the custody of Suffolk or its agents.

Moreover, the allegations that the Suffolk defendants were aware of the custody dispute and that Ligurgo had a firearm and ammunition, had set fire to his condominium, and was mentally unstable, are insufficient to support a "special relationship."  To hold otherwise would be "inconsistent with *DeShaney's* teaching that the Due Process Clause is 'not a guarantee of certain minimal levels of safety and security.'"  *Jones v. County of Suffolk*, 236 F. Supp. 3d 688 (E.D.N.Y. 2017) (quoting *Hendricks v. City of New York*, 2014 WL 3819296 (S.D.N.Y. Aug. 4, 2014)). Indeed, the following excerpt from *DeShaney* is particularly appropriate here:

> Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [Jovani] and his mother to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by [Suffolk County or its agents], but by [Jovani's] father.

489 U.S. at 202-03.

---

[4] The Court notes that while the action was commenced by Busone individually and on behalf of Jovani's estate, the amended complaint does not distinguish between the claims asserted individually and those asserted on behalf of the estate.

As Plaintiff's allegation are insufficient to invoke the special relationship

exception, the motion to dismiss the Substantive Due Process claim is granted.

**B.     The Fourth Amendment Claim[5]**

 The Fourth Amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the place
> to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

The allegations Plaintiff relies on in support of her Fourth Amendment claim

are as follows: (1) she was told by the 911 dispatcher to remain at her place of

employment to wait for the police to arrive, (AC ¶ 348) and (2) Defendants

"restrained [Busone] by ordering herself and her son to remain at the scene of the

arson while the investigation was ongoing," (AC ¶ 359). The foregoing allegations

are insufficient to plausibly support a Fourth Amendment claim. Plaintiff was

"never taken into custody, imprisoned, or physically detained or seized within the

meaning of the Fourth Amendment." *Rolon v. Henneman*, 517 F.3d 140, 147 (2d

Cir. 2008 ) (internal quotation marks omitted).  As the Defendants point out, there

are numerous examples in the amended complaint of Plaintiff's "ability to move

---

[5] Plaintiff's Fourth Amendment claim was addressed by Defendants for the first
time in briefing the instant motion in their reply brief. However, although
Defendants neglected to address it in their opening brief, Plaintiff nevertheless
addressed that claim in her opposition as if they had included it.  Accordingly,
although the Court would normally not address an issue raised for the first time in
reply, it does so here given Plaintiff has been heard on the issue.

voluntarily and freely throughout the area, from her home to her business, and then to the police precinct, all during the afternoon and evening of the events of the claim." (Def.'s Rep. at 7.)

Moreover, even if by some stretch of the imagination either allegation supports a seizure, there is a dearth of factual information to plausibly support that the alleged "seizures" were unreasonable. The reasonableness of a seizure is the "ultimate standard under the Fourth Amendment." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (citation omitted). The permissibility of any governmental seizure is thus "judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979). It is implausible to conclude that it was unreasonable for the 911 operator to require Plaintiff to place a second 911 call if she was not going to remain at the situs of her initial call. Nor it is plausible to conclude that it was unreasonable to have her remain at the site of the arson giving the intertwining of the arson and kidnapping.

The motion to dismiss the Fourth Amendment claim is granted.

## C. The First Amendment Claim

As alleged in the amended complaint, Plaintiff asserts a violation of her First Amendment rights when defendants Palumbo and Doroski "told Plaintiff and her son Anthony Busone to remove the social media posts [seeking the public's help in locating Jovani and told them that any further efforts on their part would interfere with the investigation . . . ," her compliance with that directive "was not optional"

and "induced reliance in [Plaintiff] upon Defendants." (AC ¶¶348-358) Although not included in the complaint as a basis for said alleged violation, Plaintiff argues on this motion that her "conversation with the 911 operator clearly restrained her actions and violated her First Amendment right to free speech." (Pl.'s Mem. in Opp. at 12).

Plaintiff's allegations do not fall within the rubric of a prior restraint on speech. *See Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (defining a prior restraint as "any regulation that gives public officials the power to deny use of a forum in advance of actual expression") (citations and brackets omitted); *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) ("A 'prior restraint' on speech is a law, regulation or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression.")(citations omitted); *In re G. & A. Books, Inc.*, 770 F.2d 288, 295–96 (2d Cir. 1985)("Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated.")

Nor do Plaintiff's allegations state a First Amendment retaliation claim as there are no allegations that any of the Defendants took any retaliatory action against Plaintiff in response to her social media postings. *See Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018) (To state an actionable First Amendment retaliation claim, Plaintiff "must plausibly allege that (1) [her] speech or conduct was protected by the First Amendment; (2) the defendant[s] took an adverse action

against [her]; and (3) there was a causal connection between this adverse action and the protected speech.") (internal quotation marks and citation omitted).

Rather, the First Amendment doctrine that best fits her contentions is that of time, place and manner restrictions, but even viewed in that light, it is not plausible that either "restriction" was unreasonable. That plaintiff was told she needed to remain at her place of employment or the operator would cancel the police call is reasonable as otherwise the police would be responding to a location where Plaintiff would not be available to talk to them.[6] Assuming that such was a policy of Suffolk, it is not plausible to conclude that it burdens First Amendment rights more than necessary to support the efficient deployment of police.

Turning then to the allegations regarding Plaintiff being "ordered" to remove Facebook posting regarding Jovani, the only person alleged to be involved is Doroski. (AC ¶¶ 202-210). The absence of factual allegations on the personal involvement of the other individual defendants requires dismissal of this claim as against them. *See Costello v. City of Burlington*, 632 F.3d 41, 48-49 (2d Cir. 2011). Even as to Doroski, the claim must be dismissed. First, the allegations that he "ordered" Plaintiff is conclusory in nature. As a police officer, he was entitled to impose reasonable time place and manner restriction to prevent interference with the on-going investigation. *Cf.  Stratakos v. Nassau County*, 2019 WL 6699817, at

---

[6] It is also noteworthy that none of the named individual defendants are alleged to have participated in the 911 call and thus the claim against them are dismissable on that basis as well. *See Costello v. City of Burlington*, 632 F.3d 41, 48-49 (2d Cir. 2011) (absence of acts establishing personal involvement of any of the individual defendants fatal to ¶ 1983 claim),

*7 (E.D.N.Y., Dec. 9, 2019) (noting that the First Amendment right to film police is subject to limits in situations such as "in particularly dangerous situations, if the recording interferes with police activity, if it is surreptitious, if it is done by the subject of the police activity, or if the police activity is part of an undercover investigation.") (internal quotation marks and citations omitted). Here, according to the allegations in the complaint, Doroski's statement was motivated by a concern that the posting would interfere with the ongoing police investigation of the arson and kidnapping, a concern that cannot plausibly be deemed unreasonable under the circumstances alleged. Indeed, according to the amended complaint "Busone knew and had reason to know that interfering with a police investigation could . . . .harm the chances of finding Jovani . . . ." (AC ¶ 212.) Accordingly, no First Amendment claim has been stated.

### D. The Monell Claim Against the County

Where, as here, a plaintiff has not adequately alleged a constitutional violation the *Monell* claim against the municipality necessarily fails. *See Estate of M.D. v. State of New York*, 241 F. Supp. 3d 413, 430 (S.D.N.Y. 2017 ) (citing, inter alia, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)).

Accordingly, the motion to dismiss the *Monell* claim against Suffolk is granted.

### III.    The Section 1985 and 1986 Claims

Plaintiff's claims pursuant to sections1985 and 1986 are dismissed. Section 1985 requires racial or other invidious discriminatory animus, *Thomas v. Roach¸*165

F.3d 137, 146, none of which is alleged herein. Moreover, a 1986 violation cannot be established without a 1985 violation. *See Mian v. Donaldson, Lufkind & Jenrette Sec. Corp.* , 7 F.3d 1085 (2d Cir. 1993).

## IV.     The State Law Claims

Federal district courts have supplemental jurisdiction over non-federal-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a district court may, at its discretion, decline to exercise supplemental jurisdiction over a state-law claim when: "[i] the claim raises a novel or complex issue of State law, [ii] the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, [iii] the district court has dismissed all claims over which it has original jurisdiction, or [iv] in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction, district courts must balance the "values of judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). As a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.' " *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Here, given the Court's dismissal of Plaintiff's §1983 claim, no circumstances counsel in favor of exercising

supplemental jurisdiction over Plaintiff's remaining state-law claim. Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and dismisses them without prejudice.

## CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion to dismiss Plaintiff's § 1983, 1985 and 1986 claims and dismisses those claims with prejudice, declines to exercise supplemental jurisdiction over Plaintiff's state law claims and dismisses the state law claims without prejudice to refiling in state court. The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York  
      June 22, 2021

       s/ Denis R. Hurley  
Denis R. Hurley  
United States District Judge